STOUT *v*. STINNETT.

4-7989                                    197 S. W. 2d 564

Opinion delivered November 18, 1946.

Rehearing denied December 16, 1946.

*Owens, Ehrman & McHaney,* for appellant.

*Glenn G. Zimmerman* and *Charles L. Carpenter,* for appellee.

HOLT, J.   The city of North Little Rock, by appropriate procedure, has adopted the provisions of Act 28 of the Acts of the Legislature of 1933, commonly referred to as the Civil Service Commission Act, (now appearing as §§ 9945-9964 in Pope's Digest).

May 27, 1946, the city council of North Little Rock enacted Ordinance No. 1464. Its purpose was, according to the preamble, "An Ordinance Reorganizing the Police Department of the City of North Little Rock, Arkansas: Prescribing Certain Officers' Duties: Fixing the Rate of Pay: and for Other Purposes."

Section 1 of the ordinance provided that the police department of that city should consist of "one day chief

of police," . . . and "one night chief of police." Section 5 provided that "the day chief of police shall be in charge of the police department from the hours of 6 a. m. to 6 p. m., and shall be responsible to the governing body of the city of North Little Rock and to the Civil Service Commission of the police department for the proper conduct of himself and the members of the police department during his hours of duty and for the proper enforcement of the laws of the city of North Little Rock and the State of Arkansas by the members of the police department. The day chief of police shall not engage in any other business or activities which will require any part of his time from his official duties and he shall be subject to call at all times," and § 6 that "the night chief of police shall be in charge of the police department from the hours of 6 p. m. to 6 a. m.," and in all other respects contained the same provisions as § 5.·

Following the enactment of this ordinance, the Civil Service Commission of North Little Rock, May 28, 1946, certified Jack Pyle as eligible for appointment to the office of night chief of police and J. H. Anderson, who was the then duly appointed and acting chief of police, as eligible for the appointment to the office of day chief of police. Following this certification from the Civil Service Commission, Jack Pyle was appointed and assumed the duties of night chief of police and J. H. Anderson was appointed and assumed the duties of day chief of police, as set out in the ordinance.

May 29, 1946, appellant filed this action in which he questioned the validity of the ordinance, and sought to enjoin its operation. Upon a hearing, the validity of the ordinance was upheld and injunctive relief denied. This appeal followed.

The primary question presented is: Did the city council of North Little Rock have the power to enact the ordinance in question, which provides for two chiefs of police? We think no such power existed. We are concerned only with the council's power to enact the ordinance and not with the wisdom of its enactment.

Here, a public office is sought to be created and whatever power the city of North Little Rock has in the creation of a public office must be found by express provision or by implication in our constitution or statutes. The general rule is announced in 37 Amer. Jurisprudence, p. 856, § 226, in this language: "Creation of Office.—Since the creation of a public office implies a delegation of a portion of the sovereign power to and the possession of it by the person filling the office, the source of such an office must be found in the sovereign authority speaking through the Constitution or a statute; a municipal corporation cannot create a new public office, as distinguished from a mere employment, without constitutional or statutory authority."

Prior to the passage of Act 28 of 1933, the power to appoint the chief of police reposed in the mayor. Nowhere in our Constitution or statutes, including the Civil Service Commission Act, *supra,* have we been able to find any provision—express or by implication—for the appointment of two chiefs of police or for the provision of two offices of chief of police in any one city. In all of these acts or statutes where reference is made to the police department, reference is made to "The Chief of Police" or "The Chief of the Police Department." Nowhere do we find a reference to more than one Chief.

The Act of 1875 gave the mayor the power to appoint "the chief of the police department" as well as the right to suspend him for cause. This power has now been taken away from the mayor and placed in the hands of the Civil Service Commission by Act 28, *supra.* The following provisions, however, in Act 28, are significant. "Section 1. . . . The city attorney shall act as attorney for the Civil Service Commission in all trials and other legal transactions provided that this Act shall not apply to *the chief of police* in all cities which now have, or may hereafter have, a Commission form of government, and provided further that *the chief of police* in said cities shall be appointed and removed as now provided by law. . . . Section 3. The Board of Civil Service Commissioners herein provided shall prescribe, amend and

enforce rules and regulations governing *the fire and police departments* of their respective cities, and said rules and regulations shall have the same force and effect of law. . . . These rules shall provide: . . . 7th. For a period of probation of not to exceed six months before any appointment or promotion is complete, during which period the probationer may be discharged, in case of an appointment, or reduced, in case of promotion, by *the chief of the police* or of the fire *department.* . . . Section 4. All employees, in any fire or police department, affected by this Act, shall be governed by rules and regulations set out by *the chief of their respective police* or fire *departments* after such rules and regulations have been adopted by the governing bodies of their respective municipalities. . . ."

It thus appears that in every statute enacted by our Legislature, including Act 28, where reference is made to the duties of the head of the police department, that officer is invariably referred to as *"the chief."* The word "chief" implies an executive or directing head. Webster defines "chief" as "the head or leader of any body of men; a commander, as in an army; a headman, as of a tribe, clan, or family; the directing head of a political party, government, bureau, or department, office organization, or the like; also, one's superior in such a body; chief implies hereditary or acquired rank in a tribe or clan (as an Indian chief), or more frequently, superiority in civil, rather than military office or rank, as the chief of police."

We think the word "chief" denotes one single officer and when, as we have pointed out, all through the statutes, including the Civil Service Commission Act, *supra,* the definite article "the" is used preceding the word "chief," we think the intention of the lawmakers to provide for but one office of chief of police becomes clear and certain.

While it is true that statutory power to create the office of the chief of police carries with it the power of the city council to abolish that office, as we held in *Ellis*

v. *Allen,* 202 Ark. 1007, 154 S. W. 2d 815, and *Fiveash* v. *Holderness,* 190 Ark. 264, 78 S. W. 2d 820, it does not follow that the city's lawmaking body had also the power, express or implied, to create two such offices.

While the exact question presented appears to be of first impression in this state, we think the rules of law announced by the Connecticut Supreme Court of Errors in *State of Connecticut ex rel. Otto G. Stage* v. *Robert Mackie, Appt.,* in 82 Conn. 398, 74 Atl. 760, 26 L. R. A., N. S., p. 660, which case is cited in support of the general rule, *supra,* apply with equal force to the question presented in the present case. The facts in that case were similar in effect to those now before us. There, (quoting from the court's statement) "the charter of the city of Waterbury (Conn.) provided that its board of aldermen might, in a manner prescribed, make ordinances 'to provide for the appointment of a building inspector and to prescribe his duties.' . . . Having this authority, the board adopted an ordinance creating the office of building inspector, and defining the powers and duties of its incumbent. It was also provided that there should be a deputy building inspector, that he should act in place of the building inspector and exercise all of his powers during the latter's absence or disability, and in the event of the latter's death perform all of his duties until an appointment should be made to fill the vacancy, etc."

Under this ordinance, the board of aldermen appointed a building inspector and a deputy building inspector. Proceedings were brought to oust the deputy building inspector on the ground that the city aldermen were without authority to create the office. In the body of the opinion, it was said: "The position in question is one to which the ordinance creating it attempted to attach important powers and functions of government belonging to the sovereignty, and therefore was a 'public office,' as distinguished from a mere employment or agency resting on contract, and to which such powers and functions are not attached. . . . 'A public office is the right, authority, and duty created and conferred by law by which . . . an individual is invested with

some portion of the sovereign functions of the government to be exercised by him for the benefit of the public.' It 'implies a delegation of a portion of the sovereign power to and possession of it by the person filling the office.' . . . It is a trust conferred by public authority for a public purpose, and involving the exercise of the powers and duties of some portion of the sovereign power. . . . Such being the nature of a public office, it is apparent that its source must in this country be found in the sovereign authority speaking through Constitution or statute. The creations of the sovereign power cannot, in the absence of a delegated authority, create one. . . . The source of the alleged office here in controversy is a city ordinance. The state had delegated to the city in its charter the power to provide for the appointment of a building inspector, and to prescribe his duties. . . . It had not delegated the power to provide for the appointment of a deputy building inspector, and to prescribe his duties. The city was without inherent power to create such a public position and to endow it with the jurisdiction and authority attempted to be conferred. No such power was impliedly granted by the charter provision referred to. The right to create one office does not imply the right to create two. . . ."

The case of *State* v. *Martin*, 60 Ark. 343, 30 S. W. 431, 28 L. R. A. 153, relied upon by both parties to this litigation, we think, clearly distinguishable and not controlling here.

For the error indicated, the decree is reversed and the cause is remanded with directions to enter a permanent injunction in accordance with the prayer of appellant's complaint.

GRIFFIN SMITH, C. J., dissents.